## Case No. 8,888.

McLEAN v. LAFAYETTE BANK et al.

[3 McLean, 587.] [1]

Circuit Court, D. Ohio.    July Term, 1846.

BANKRUPTCY — ADJUSTMENT OF LIENS — FRAUD—PREFERENCE—INSOLVENCY — EFFECT OF TAKING MORTGAGE — BONA FIDES — BANKS—AUTHORITY TO DISCOUNT—USURY.

1. In bankruptcy, the circuit court will exercise jurisdiction over distinct interests and parties, on allegations of fraud, in order to adjust liens and make distribution of assets.

[Cited in Foster v. Ames, Case No. 4,965.]
[Cited in Olney v. Eaton, 66 Mo. 564.]

2. The assignee of the bankrupt may take advantage in behalf of creditors, of any preference or other acts by the bankrupt, in violation of the bankrupt law.

3. The books and schedules of the bankrupt are evidence under this head.

4. The taking of a mortgage by a bank from its debtor, does not show that the bank considered him to be insolvent, nor that the mortgagor contemplated bankruptcy.

5. The second section of the bankrupt act [of 1841 (5 Stat. 440)] does not render void a contract or conveyance made two months before the bankruptcy, whatever may have been the intention of the bankrupt, if the other party acted fairly and had no notice of his intention.

6. The party impeaching a contract, on the ground of fraud, must prove the fraud.

7. A contemplation of bankruptcy means—in contemplation of a state of bankruptcy. This means more than an inability to pay debts promptly. It means a thorough breaking up of his business by the bankrupt. [2]

[Cited in Ashby v. Steere, Case No. 576.]

8. The charter of the Franklin Bank, which authorizes it to discount notes, &c., on banking principles, does not make void a contract or note, reserving more than six per cent. interest. [2]

[Approved in Darby v. Boatman's Sav. Inst., Case No. 3,571.]
[Quoted in Rock River Bank v. Sherwood, 10 Wis. 182.]

9. The words, "principles and usages of banking," mean the right to receive interest in advance.

[Cited in Pape v. Capitol Bank of Topeka, 20 Kan. 447.]

10. The general law regulating interest applies to the Franklin Bank.

---

[1] [Reported by Hon. John McLean, Circuit Justice.]

[2] [See note at end of case.]

11. The purchase of a bill, at any price, is not usurious. The statute gives, on the loan of money, "six per cent. per annum, and no more." 2

[Approved in Darby v. Boatman's Sav. Inst., Case No. 3,571.]

12. A bill purchased, must be complete, so as to enable the purchaser to bring suit on it. A bill not accepted is not of this character.

13. When paper is the basis of exchange, it may 'be shown as influencing the rate of exchange.

14. The rate of exchange is a fact to be established by evidence, like any other fact.

15. If the rate of exchange charged be only colorable, it is usurious.

16. The court will not presume that a combination existed to increase the rate of exchange. Such a charge must be proved by the clearest evidence.

17. A discount of a bill, on which exchange is charged to take up a prior bill, is not usurious, unless it be shown that such an agreement was made at the discount of the first bill. 2

18. A prior mortgagee has a right to release his claim on the payment of his debt, unless he have actual notice of the claims of subsequent mortgagees.

[Cited in George v. Wood, 9 Allen, 82.]

19. The lien of a satisfied judgment cannot be revived in favor of one of the defendants, who was surety, to the prejudice of third parties.

20. A surety, having paid the debt, has a right to all the collaterals held by his principal, but cannot claim the assignment of the instrument which is evidence of the debt against the principal and himself.

21. By giving collateral security to the Franklin Bank, by its debtor, the charter lien is discharged.

22. A judgment lien is good under the bankrupt law, and, being prior to a mortgage, must be first satisfied.

23. The charter of the Lafayette Bank provides, that it shall not take more than six per centum per annum, in advance, on its loans or discounts. This provision is similar to the one in the Bank of Chillicothe, and to the general act regulating interest. The rule of construction should be the same, on words of the same import, whether found in the charter of a bank, or in the general law.

24. On general principles, a contract made against law, or in violation of the policy of the law, is void.

[Cited in Tufts v. Tufts, Case No. 14,233.]

25. The law in Ohio is settled, that usury voids the contract only for the excess.

[Approved in Darley v. Boatman's Sav. Inst., Case No. 3,571.]

26. If the bills were void, and the mortgages, the money actually paid by the bank could be recovered. But the bills were not usurious. The regular interest only was paid in advance, and the established rate of exchange was charged for bills. 2

27. Stock transferred to the bank as collateral security, for the time, extinguishes the charter lien.

28. A note being renewed, omitting one of the indorsers, he is not liable, and can claim no lien as such.

29. A co-security may claim that property, given to indemnify the other surety, may be sold for the benefit of both. But this cannot be done where the other surety is discharged by the payment of the debt.

30. Where parties, not within the jurisdiction of the court, appear voluntarily, the court can take jurisdiction.

31. Where a mortgage is given on personal property, which remains in the possession and under the control of the mortgagor, and he sells the property, in part, in payment of other debts, &c., the mortgage must be considered fraudulent and void.

[Cited in Fairbanks v. Amoskeag Nat. Bank, 38 Fed. 634.]

32. A concealment of a mortgage, by fraudulent representations to the injury of third parties, is void.

33. A mortgage to indemnify, may be subjected to the rights of the creditor, though the mortgagee may not have paid the debt.

34. Where a lien is common to two or more creditors, and one of the creditors has a lien on a separate property, equity will require the separate lien to be enforced first.

35. A contract made within the two months previous to the filing of a petition by a bankrupt, does not stand as if made prior to that time.

36. Such a contract is prima facie fraudulent— or, at least, it must be shown to be bona fide.

37. A judgment confessed within the two months before filing the petition, where the bankrupts had broken up their business, &c., is fraudulent, and also the proceedings under it. 2

[This was a bill by Nathaniel McLean, assignee in bankruptcy of John Mahard, Jr., and William Mahard, partners as John Mahard & Co., to set aside certain transfers of stock of the Lafayette Bank and mortgage of real estate made by the bankrupts, and claimed to be fraudulent as to their creditors. An injunction was granted to stay proceedings in the state court seeking to enforce the alleged fraudulent preferences. The case was formerly heard upon motion to dissolve this injunction. Case No. 8,885. Subsequently an amended bill was filed, to which the defendant demurred. The demurrer was overruled. Id. 8,886. Complainant moved for a receiver to take charge of a farm, a part of the property alleged to have been fraudulently transferred. The motion was allowed. Id. 8,887. It is now heard upon all the papers in the case as to the validity of the alleged fraudulent liens and transfers.]

Wright, Fox, Miner, Corry, Russel & Corwin, for complainant.

Groesback, Chase, King & Anderson, for defendants.

OPINION OF THE COURT. In this bill the complainant prays, that the property of Mahard, real and personal, may be brought into the bankrupt court for distribution, and that the various liens under which the defendants claim may be set aside and annulled as fraudulent under the bankrupt and state laws. An injunction was granted to

stay proceedings in the state courts on the mortgages and other liens set up by the defendants. The case in all its branches has been argued with much research and distinguished ability. As many of the defendants assert distinct interests, which are in no respect connected, a demurrer on that ground was filed to the bill. At a former term this demurrer was overruled, and the jurisdiction of the court sustained. Since then, the case of Ex parte Christy, 3 How. [44 U. S.] 308, has been decided, which maintains the ground assumed by this court. In February, 1837, John Mahard, Sen., and John Mahard, Jun., having been co-partners in a commercial business in Cincinnati, dissolved; and a new co-partnership was formed between John Mahard, Jun., and William Mahard. The same persons constituted a partnership in New Orleans. On the 27th of May, 1842, John Mahard, Jun., filed his petition under the bankrupt law, and on the 20th of July ensuing, obtained a decree of bankruptcy. William Mahard on the 12th of August following, petitioned for the benefit of the act, and, in due course of proceeding, was declared a bankrupt. The Cincinnati firm exhibited an amount of debts exceeding one hundred and seven thousand dollars, while its assets were little more than the sum of five thousand dollars. The firm at New Orleans seems to have owed, independently of its indorsements, about the sum of thirty-eight thousand dollars; and it returned nominal assets to nearly the same amount. In the list of debts are included the sums due to the defendants, and a statement of the mortgages given to them. There is no suggestion that the schedules filed in the bankrupt court do not contain a correct statement of the condition of the respective firms. The mortgage to the Franklin Bank of Cincinnati will be first considered. This instrument is dated the 3d of April, 1841, and was recorded the 18th of October ensuing. It was given on in-lots 404 and 460, in Cincinnati, by John Mahard, Jun., to secure the payment of about the sum of sixteen thousand dollars; for which he was then responsible to the bank, and "all other liabilities to the bank which he might afterwards incur." This mortgage was signed and acknowledged before the bankrupt law was passed, but, under the Ohio statute, it did not take effect until it was recorded, which was subsequent to the passage of the bankrupt act. That act did not go into operation until the 1st of February, 1842. The validity of this instrument is objected to on several grounds. 1. That it was intended to give a preference to the Franklin Bank over other creditors, the firm being at the time insolvent. 2. That it is void, as it was designed to secure debts which the bank had no power to contract. 3. That the debts secured by it were usurious.

To show that both firms commenced business without capital, and rested entirely upon credit, through the whole course of their business, in the concluding argument the books of the partnerships were referred to, and other evidence in the case. John Mahard, Jun., is a witness, and swears that until about the time of filing his petition, he considered himself solvent; and that the firm at Cincinnati were able to go on with their business. The books and the schedules are evidence, if for no other purpose than to lessen the weight of this statement. But they are clearly admissible on general principles, as facts which may conduce to invalidate liens created to benefit certain creditors to the prejudice of others. In this respect the assignee represents the creditors, and may take advantage of a preference and fraud which the bankrupt could not do. By the fifth section of the act of Ohio, of the 11th of February, 1832, a fraudulent transfer of property to defeat creditors is made a penal offense. And by the third section of the act of the 14th of March, 1838, it is declared that "all assignments of property in trust, which shall be made by debtors to trustees, in contemplation of insolvency, with the design to prefer one or more creditors to the exclusion of others, shall be held to enure to the benefit of all the creditors in proportion to their respective demands." The assets of both firms may be considered nominal at the time of their failure; and from their books it would seem that the partnership business was carried on mainly, if not exclusively, by discounts and the sale of bills. The property mortgaged was owned by John Mahard, Jun. It may be that funds from the proceeds of the partnership were used in the purchase of a part of this property. Of this, however, there is no positive evidence. The fact of taking this mortgage, it is insisted, goes to show that the Franklin Bank doubted the solvency of the Mahards. Such security to banks is not unusual, and although it may show on the part of the bank a desire for a higher security than that of an indorsement, yet it does not prove that the borrower is considered insolvent. Mahard may have executed the mortgage in preference to giving an additional indorser. At the date of this mortgage the credit of the Mahards seems to have stood fair. No facts have been proved in the case, which conduce to establish the fact, that at that time they contemplated bankruptcy, or a state of insolvency, within the bankrupt or state law. Much less is there any evidence that the bank, in taking the mortgage, acted under a knowledge that a state of bankruptcy or insolvency was contemplated by the mortgagor. A rigid scrutiny into the affairs of the firms, so as to ascertain the amount of their capital by their creditors, is not to be presumed. They did a large and, apparently, a prosperous business in the winter of 1840 and 1841. And it was not until the 2d of August, 1841, that any one of their notes was protested. Subsequent to this period, their bills were occasionally protested, sometimes

for non-acceptance, and at others for non-payment. In the summer of this year, Mr. Groesbeck, the president of the Franklin Bank, refused to increase Mahard's indebtment.

In this part of the case, it may be proper to give a construction to the second section of the bankrupt act, which, it is contended, vitiates all the liens set up by the defendants. That section provides, "that all future payments, securities, conveyances, or transfers of property, or agreements made or given by any bankrupt, in contemplation of bankruptcy, and for the purpose of giving any creditor, indorser, surety, or other person, any preference or priority over the general creditors of such bankrupt; and all other payments, &c., in contemplation of bankruptcy, to any person or persons whatever, not being a bona fide creditor or purchaser, for a valuable consideration, without notice, shall be deemed utterly void, and a fraud upon this act." "Provided, that all dealings and transactions, by and with any bankrupt, bona fide made and entered into more than two months before the petition filed against him or by him, shall not be invalidated by this act: provided, that the other party to any such dealings or transactions had no notice of a prior act of bankruptcy, or of the intention of the bankrupt to take the benefit of this act." Then follows the clause: "If it shall appear to the court that the voluntary bankrupt, since the 1st of January, 1841, or at any other time, in contemplation of the passage of a bankrupt law, by assignment or otherwise, has given a preference to one creditor over another, he shall not receive a discharge unless a majority of his creditors shall consent thereto." And by another proviso, in the same section, liens valid under the state law are not to be affected by the act, if not inconsistent with its provisions. This section has given rise to much controversy, and the courts have not altogether concurred in its construction. It has not been construed by the supreme court. Where, in contemplation of bankruptcy, and to give a preference to one creditor over another, a payment or transfer of property is made, it is void under the first part of the section. But, by the first and second provisos, all bona fide transactions, more than two months before the petition was filed, and where the other party had no knowledge of an act of bankruptcy, or notice of an intention by the bankrupt to take the benefit of the act, are not invalidated by the act. From this it is clear, that before the two months a creditor or purchaser, acting bona fide, and without knowledge that the bankrupt had committed an act of bankruptcy, or intended to apply for the benefit of the act, might, in every respect, make as valid contracts with him as with any other citizen. And where a contract is impeached under these provisos, the party impeaching it must show that it was not made bona fide. A fraud at common law, or under this act before the two months, is not presumed. The above refers to the good faith of the purchaser or creditor, without regard to the motives of the bankrupt. He may have committed an act of bankruptcy, or intended to apply for the benefit of the act, and, consequently, acted in bad faith, still the contract is valid, if the other party has acted in good faith, and without the knowledge or notice specified.

But the important inquiry remains to be answered, what shall amount to a "contemplation of bankruptcy," and a preference of a creditor, within the section. It would seem, from some of the arguments in this case that nothing short of an avowal of an intention to take the benefit of the act and to give a preference, is within this section. This is clearly wrong. The courts, or juries under the instructions of the courts, must determine in this, as in other cases of fraud. This, being a fraud under the act, may not possess that turpitude which attaches to a fraud at common law. It may, indeed, separated from the statute, have the appearance of a just, if not a meritorious act; but whether it violate the statute, must be ascertained as in a common fraud. We may give a definition of fraud, but no court or jurist can lay down an unvarying rule, applicable to all cases, by which an act shall be held fraudulent. The character of the act, not unfrequently, depends upon the intention with which it was done. And we can only judge of the intention from the act and its attending circumstances. These are as diversified as human transactions. It is contended that the words, "in contemplation of bankruptcy," must be construed to mean, an "intention to take the benefit of the bankrupt law." An individual may be reduced to a state of bankruptcy, and yet, from pride, or other motives, not intend to take the benefit of the law. Now, if the construction contended for be correct, such an individual might, in contemplation of a state of bankruptcy, prefer certain creditors to others, without any violation of the act. This would defeat the great object of the law, which was, to secure to creditors a pro rata distribution of the estate of the bankrupt. A construction which leads to this, requires no further comment. The term bankrupt, as used in the act, has no technical significancy which sustains this view. "In contemplation of bankruptcy," means, in contemplation of a state of bankruptcy. Had congress meant more than this, they would have said so. Had an intention to take the benefit of the act been the thing "contemplated," it would have been expressed in appropriate terms. But such a provision would not have reached the evil to be remedied. A state of bankruptcy reaches the evil, and the above provisions of the act give a remedy.

A state of bankruptcy, or insolvency, means more than a mere inability to pay debts promptly. Such are the vicissitudes of trade,

that but few of our enterprising merchants have not, at different periods in their course of business, been in this predicament. They were, perhaps, unable to meet the demands against them under any reasonable indulgence, had they closed their concerns. But their credit was good; they met promptly the current demands against them, and soon retrieved their affairs. A bankruptcy within the law, not only presupposes an inability to pay debts, but to continue in business. The preference of one creditor over another, implies an inability to pay both, and a determination to prefer one to the other. If, at the time Mahard executed this mortgage to the Franklin Bank, on a strict account of the partnership funds, they had been found inadequate to meet the partnership debts, it would not follow that the firms were insolvent. The private property of John Mahard, Jun., was liable, and this, being of large amount, gave credit to the partnerships. That the Mahards, at this time, did not contemplate closing their business is clear, as they continued it through the summer and fall of 1841. In October of that year, their embarrassments became so great as to induce them to apply to the "Lafayette Bank" for relief, to enable them to carry on their business. Whether this application was made known to the Franklin Bank does not appear. Why this mortgage was withheld from record, from the 3d of April, the day of its date, to the 18th of October, is not shown. This circumstance is not proved to be so connected with other facts as to authorise an unfavorable presumption against the bank. On a full consideration of the facts and circumstances connected with the execution and recording of this mortgage, it cannot be held void under the second section of the bankrupt act, nor does it come within the state law above cited.

Under the second head, it is argued, that this mortgage is void, as it was given to secure a debt which the bank had no power to contract. In support of this position, it is alleged, that the charter of the Franklin Bank prohibits it from taking more than six per cent. interest, and that a larger amount than that was received on the loans made to the Mahards, which, consequently, makes void the contract. In the case of Bank of Chillicothe v. Swayne, 8 Ohio, 254, the court held, that a bill of exchange which the bank had discounted at a greater rate of interest than six per cent. per annum was void, under a provision in its charter, that it should "not take more than at the rate of six per cent. per annum on its loans or discounts." The same principle has been sanctioned by the same court in subsequent cases. Before these cases are more particularly referred to, it may be proper to examine the charter of the Franklin Bank, to see if it contains a prohibition which will bring it within the principle of the above cases. It is admitted that, in terms, no prohibition against taking more than six per cent. interest is in the charter,

but is supposed to be contained in the following words. "And it shall be lawful for said bank to loan money, buy, sell, and negotiate bills of exchange, checks, and promissory notes, and to discount upon banking principles and usages, bills of exchange, post notes, promissory notes, and other negotiable paper or obligations for the payment of a sum of money certain."

The power to "discount upon banking principles and usages," it is contended, imposes upon the bank a prohibition against receiving on its loans and discounts more than at the rate of six per cent. per annum. And this prohibition, thus brought into the charter, is to make void any contract made by the bank in violation of it. It, therefore, must be made to operate as a penalty. Now, that penal laws must be construed strictly, is a rule from which, it is believed, no court has departed; and yet, without such departure, it would seem the above prohibition cannot be made to operate in this charter. What is the plain and obvious meaning of the words, "principles and usages of banking?" It is, that the bank may take, on loans and discounts, the interest in advance. Many bank charters give this power specially. Without it, courts have held that taking the interest in advance is usurious. And strictly, this is so. But other courts have decided, that they would regard the usages of banks so far as to legalise this practice, though the charters may contain no provision on the subject. That this was the main object of the above provision, there would seem to be no doubt. If it include the prohibition contended for, because such prohibition may be found in other charters, it must equally include all other provisions in these charters, which are not found in the Franklin Bank charter. This would be a new rule for construing a contract. And especially would it be a new mode of introducing a prohibition into a charter. There can be no doubt, that the general law regulating interest applies to the Franklin Bank.

This leads us to the question of usury, which is the third objection made to this mortgage. This objection equally applies to the mortgages taken by the Lafayette Bank, and as the facts which bear upon this point apply, substantially, to both banks, the objection will be now considered. John & William Mahard, of the Cincinnati firm, were in the practice of drawing bills, at four months, on Mahard & Brother, of the New Orleans firm. The same persons, it will be observed, composed both firms. These bills were discounted by the banks, and, in addition to the rate of six per centum interest, per annum, was charged, from one to two per cent., for exchange; and on one or two occasions, three per cent. Several witnesses proved, that the rates of exchange thus charged were regulated principally by the banks who discounted the bills, and brokers and grocers, who, to a limited extent, were in the practice

of purchasing such bills. It was proved that sight bills drawn on New Orleans, at Cincinnati, with the exception of the months of March and April, in the year 1842, commanded, uniformly, a premium. This exception arose from peculiar causes, and, being subsequent to the transactions before us, does not affect the question now under consideration. On time bills on New Orleans, exchange was charged at the rate of about a half per cent. per month for the time the bill had to run. The act fixing the rate of interest declares, "that all creditors shall be entitled to receive interest on all money, after the same shall become due, &c., at the rate of six per cent. per annum, and no more." A question is made, whether the banks did not purchase these bills. A purchase of a bill, at any price, is not usurious. It may be bought in the market, like a commodity, as the parties shall agree. But a bill to be thus sold must be complete. It must be in such a state as to enable the holder to bring suit on it. There is no evidence that these bills were in this condition. On the contrary, it appears that they were bills drawn by the house on New Orleans, to be accepted by the firm there. The proceeds of the bills were placed to the credit of the drawers. John Mahard, Jun., conducted the house in Cincinnati, and his brother William the one in New Orleans. If these bills were not accepted before they were negotiated with the banks, and the holders had paid no valuable consideration for them, they were discounted and not purchased. It is probable, that this distinction was not adverted to by the banks, but it was important, as it gave the character to the transaction. If the bills had been purchased at a discount of twenty per cent., there could be no legal objection to them. But, if they were discounted, with a reservation of interest exceeding the rate of six per centum per annum, it was usurious. And this is the question we are now to examine. There is nothing on the face of the bills which indicates usury; and it is not pretended that interest, as such, above the legal rate was charged. But it is contended, that the exchange charged was colorable only, and with the view of extorting illegal interest. That this allegation is not without plausibility, must be admitted. It seems the banks discounted these bills, when they refused ordinary discounts. Bills were preferred, one of the witnesses says, because they afforded, by the exchange, a higher profit to the banks. And then it appears, that sight bills on New Orleans uniformly sold for a premium. It seems that the exchange charged had no reference to a specie basis. At the time, the banks had suspended specie payments, and the paper of these banks, in both cities, constituted the medium of circulation. This paper was at a discount, for specie, of from five to ten, perhaps a greater, per cent. Its value was effected as the prospect of resumption of specie payments by the banks became

more or less remote. The resumption by the Cincinnati banks, in March and April, 1842, caused exchange in that city to sell for a premium in New Orleans. It is true, that the holder of bills, payable in either city, could demand payment in specie, unless by the contract currency was to be received; but the paper basis is stated as having some influence on the present question. The laws of trade equally apply to the business of exchange. The balance must be adjusted by specie or its equivalent. And it is often said, but not with strict accuracy, that the difference of exchange between two places, is the expense of transporting specie from one to the other. That this expense is one of the principal elements of difference is undoubted. But there are other things which materially influence the rate of exchange. When specie becomes a commodity, as it does when used to restore the balance of trade, like every other commodity its price depends upon the demand and supply. The value of this article is regulated by the vicissitudes of trade. Great as are the fluctuations of exchange in reference to a specie basis, they must be still greater when the basis is a depreciated currency. This introduces a new element, the solvency of the banks, which must be greatly influenced by public opinion. It was in this disturbed state of the currency, that the transactions under consideration took place. The currency of either city became more or less valuable, as it might enable the holder to make profitable investments in foreign merchandise, or other property, or to pay debts.

It is objected that these facts can have no influence on the question under consideration. That they influenced the rate of exchange, between the two cities is undoubted. And if they did this, are they not a part of the case? No just and legal result can be come to, which shall exclude them from consideration. And more especially are they important as conducing somewhat, perhaps, to show the great difference in value in the Cincinnati market, between bills at sight and on time. The longer the time the bill had to run the greater the risk. I do not speak of the legal result, but of the practical and commercial view which influenced the rate of exchange. This view seemed to be necessary from the evidence in the case. But on this question it is unnecessary to go into the grounds of the charge for exchange. The rate of exchange is a fact to be ascertained and established by the evidence. Like the price of any vendible commodity it depends upon the market. If the charge for exchange is a mere shift or device to cover usury, the act is not the less usurious. Many most respectable witnesses have been examined on this point, and there is no conflict in their testimony. They all agree that the rates of exchange charged by the banks, were the market rates. Banks, brokers, grocers, and all others who purchased similar bills on

time, received them at the same rates of discount. No market rate of any thing could be more clearly established. Shall the court inquire into the grounds of this charge, and upon their own views of its propriety and justice, set aside and disregard this evidence? If they may do this in regard to the rate of exchange, why not do the same in regard to the market price of flour or any other article of merchandise? These depend upon the same principle and must be proved in the same way. When the court or jury as the case may be, are not brought by the evidence to the conclusion that the pretence under which the charge was made was a mere cover for usury, they cannot pronounce the act usurious.

It is suggested that a combination may have been formed by bankers, brokers and others, to establish the market rate of these bills. No evidence is produced to establish this, except the supposed unreasonableness of the charge. Whether the banks realised a profit or loss in this business, cannot affect the legal question; but it may not be improper to say, in reference to the character of the persons implicated, that one of the cashiers stated they found it a losing business. The court would require strong evidence to pronounce such a combination against a community so respectable, intelligent and commercial, as that against which the imputation is made. It includes a considerable portion of the most enterprising citizens of Cincinnati. Not only the grocers, brokers, and bankers of the city are included, but the stockholders of the banks.

These views seem to be sustained by the supreme court in the case of Creed v. Commercial Bank of Cincinnati, 11 Ohio, 495, where the court say: "On the Louisville bills (which were for sixty and ninety days) the bank charged six per centum interest per annum, and one per centum exchange, which was the market value of such bills, and the same rate at which they were purchased by other banks in Cincinnati; although exchange between the two places, Cincinnati and Louisville, on sight bills, was at par." And in page 498: "If certain rates of exchange were received, they were the fair market rates at the time." Some of the bills, it is said, were renewals of former discounts. It is not perceived that this can be material, unless it be connected with the original agreement to renew. Such an agreement would conduce strongly to establish a device to cover usury. Where a bill is drawn on New Orleans, or any other place, bona fide, and the acceptor is unable to meet it, there can be no objection to a discount of a new bill at the same rate, to pay the first one. This, it is true, would show an extravagant rate of interest and charges, in the course of a year; but the bills discounted are as distinct, as if the proceeds were to be applied to different objects. And in this latter case, the same rate would be charged.

On the 15th of February, 1837, John Mahard, Jun., executed a mortgage on the above lot 460, to secure the payment of an annuity to John Mahard, Sen., of seven hundred dollars per annum, during his life. Afterwards at the instance of John Mahard, Sen., John Mahard, Jun., conveyed a part of this lot to William Mahard, who agreed to pay John Mahard, Sen., a life annuity of one hundred dollars per annum. At the decease of John Mahard, Sen., there was a balance due of the annuities, and there is no doubt that both these liens are paramount to that of the Franklin Bank. Subsequent to the mortgage on lot 404, to the Franklin Bank, Mahard sold it to Dyer for ten thousand dollars; and the bank, at Mahard's request, released its mortgage on receiving of the purchase money seven thousand two hundred ninety-seven dollars and thirty-three cents, which is admitted as a credit on the claim of the bank. This credit, it is insisted should have been, and should now be, for the full value of the property sold. That the Franklin Bank has no right to release any thing which may prejudice subsequent mortgagees, who, on principles of equity, have a right to impose certain restrictions on the first mortgagee in the sale of the mortgaged premises, and, in fact, to redeem them and claim under the first mortgage.

These general principles must be admitted, but they can only apply where notice was given to the first mortgagee of the subsequent liens as in case of a mortgage to secure future advances; and there is no proof of actual notice in this case. The bank in its answer denies notice, and constructive notice from the recording of the subsequent mortgages is insufficient. It appears that the balance of the consideration was paid to Buckinghams, who were subsequent mortgagees. Guion v. Knapp, 6 Paige, 35; Nelson's Heirs v. Boyce, 7 J. J. Marsh. 401; Sherras v. Craig, 2 Pet. Cond. R. 411. The Franklin Bank also claims a lien on twenty shares of stock under an arrangement with John Mahard, Jun., before the 8th of March, 1842, and also under the charter lien of the bank. Bodman having made a purchase of real property from John Mahard, Jun., on which he was to pay the above stock in the Franklin Bank, which he owned, in part consideration; and finding after the purchase there was a lien on the property under a judgment obtained by Tron, against John Mahard, Sen. and John Mahard, Jun., he retained the stock in his own name to indemnify him against the judgment. This judgment was paid by John Mahard, Sen., who now claims that he paid the judgment as the security of John Mahard, Jun., and therefore has a right to be subrogated to all the rights of the plaintiff in the judgment, which must be satisfied by a sale of the property purchased by Bodman, or the stock which was received in part consideration for the property.

The charter lien is set up under the tenth section of the act which provides, "that the shares of the capital stock of said bank shall be considered and held in law as personal property, and assignable and transferable, only on the books of the same in the presence of the president or cashier thereof, and in such manner as the directors shall prescribe; but no stockholder indebted to said bank, for any debt or demand due and payable, shall have power to assign or transfer any share or shares he may own of the capital stock therein, &c,, until such debt or demand shall be paid or discharged, or collateral security be given," &c. "And said bank shall have the first lien in law on all stock due." To make a legal assignment of the stock the requisites of the charter must be observed; but the equitable interest of the stockholder may be conveyed bona fide, in any other mode, and a court of equity will give effect to such conveyance, as between the parties, if there be no paramount lien on the stock. After the judgment of Tron was paid by John Mahard, Sen., Bodman, on account of the lien of that judgment, had no right to retain the stock. But it is claimed by Mahard Sen., who, as surety, paid the judgment. The Mahards, senior and junior, were doing business in co-partnership, when the note, on which Tron obtained his judgment, was executed. Before the judgment this partnership was dissolved, and John Mahard, Jun., agreed to pay the debts of the firm. Suit was brought on the note to Tron, which, having been given jointly, authorised judgment against both the Mahards. An execution was issued on the judgment, which was paid by Mahard, Sen., and which was returned satisfied. Now the question is made whether, under these circumstances, Mahard, Sen., can claim so much of this stock as will indemnify him under the Tron judgment. The judgment constituted a lien on the property of Tron, and the stock was intended by Tron to save him from loss from that lien. That a surety having paid the debt has a right to all the collateral securities held by the creditors is not controverted. But it is insisted beyond this, that the surety is entitled to be subrogated to all the rights of the creditor; and to this effect was the decision in Morley v. St. Alban, 11 Ves. 21; and in the case of Lidderdale's Ex'r v. Executor of Robinson, 6 Pet. Cond. R. 656, a sanction is given to the same doctrine. This latter decision was given under a Virginia statute, but in their opinion the court say: "This then is the settled law of the state in which this contract and this cause originated." "But we feel no inclination to place our decision upon that restricted ground, since we are well satisfied with its correctness as a general principle." In that case the court held that the surety, being a joint indorser on a bill of exchange, which, by a statute of Virginia had the rank of a judgment, could claim the priority of a judgment creditor from his co-endorser for the amount paid above one half of the debt.

Mr. Justice Story says in his Equity Jurisprudence (section 499): "It seems formerly to have been thought that the surety had the right to claim of the creditor, on paying the debt, an assignment to him of the instrument by which it is evidenced." But, he says, "the doctrine is now fully established that the surety has no such right to be enforced in equity." Formerly a surety paying a bond debt, in the marshaling of assets, was considered as having a priority over simple contract creditors; but this doctrine was overruled in the case of Copis v. Middleton, 1 Turn. & R. 224; and has since been considered as settled by that decision. After a bond or other instrument evidencing a debt shall be fully paid, it is not perceived how it can be made the ground of a suit. If the surety on the bond shall take an assignment of it, in equity, it might give a control of a suit brought in the name of the obligee; but where the bond is paid the obligee has no claim on the obligor. John Mahard, Sen., was not the surety of John Mahard, Jun. He was a principal in the note and in the judgment, and the undertaking of John Mahard, Jun., to pay the debts of the firm, at the dissolution of the partnership, could only give a remedy on such contract. When one partner pays more than his proportion of the debts of the partnership, a contribution will be decreed as between co-securities. And in such a case the partner who has made the payment, will be substituted to the rights of the creditor as against the co-partner. To this effect was the case of Sells v. Hubbell's Adm'rs, 2 Johns. Ch. 393. Hubbell and Bedient were partners, and gave two notes to Sells; Hubbell died, and judgment was obtained against Bedient as surviving partner. Bedient took the benefit of the insolvent act, and executions on the judgments were returned nulla bona. Suit was brought on the judgments against the representatives of Hubbell, and the money was obtained from them. Afterwards it was discovered that Bedient had not returned his real estate in the city of New York on his schedule. The court ordered that a moiety of the judgments should be assigned to the representatives of Hubbell, that the money might be made out of the real estate of Bedient. Here the judgments against Bedient which had been discharged were set up and a remedy given on them. And this seems to be the doctrine in New York and in some of the other states. Eddy v. Traver, 6 Paige, 521. But, it is opposed to the modern English doctrine which seems to me to be founded in reason. How a judgment or a bond, having been discharged, can be resuscitated, so as to affect the rights of third parties, I cannot perceive. And if the rights of third parties cannot be affected by such a procedure, I can see no advantage in the principle asserted. As between the parties, it cannot be material in what mode the liability

is enforced. And if the remedy contended for can go no farther than this, it is of no value.

A judgment lien cannot be revived after satisfaction of the judgment, to the prejudice of a third party. Why then attempt to set up the judgment, when a direct decree for the payment of the money will give the same remedy? It is a form without substance, unreasonable in its nature, and without benefit in its result. The judgment obtained against the Mahards has been satisfied, which appears from the return on the execution. Can this judgment be revived and a consequent lien be made to attach on the house and lot purchased by Bodman? I think it cannot. The stock has been transferred to John Mahard, Jun. Can the rights of the bank or of other creditors be affected by the resuscitation of the judgment? The same principle is involved in this as in the lien above stated. Third parties are prejudiced by it, who are innocent and in the nature of things could have no notice to affect their consciences. The collateral security given by John Mahard to the bank, discharges its charter lien. Until his debt is paid or secured to the bank by the stockholder, the bank is declared to have the first lien in law on the stock. In its answer the bank claims the stock under an agreement made with Mahard to receive it at par on account. There is no proof of this agreement, which, in the answer, is stated to have been made on or before the 8th of March, 1842. The fact is not denied by the counsel, and is understood to be admitted. As soon as the lien of the Tron judgment on Bodman's lot became extinct, the stock virtually became vested in Mahard, and in equity, was subject to the charter lien. And although the lien might not attach from debts collaterally secured, yet the arrangement to take the stock at par, though made on the 8th of March, 1842, must be held valid. There is no knowledge possessed by the bank, shown by the evidence, which can invalidate the transaction. At the July term, 1841, of the superior court of Cincinnati, a judgment was obtained in the name of the Bank of the United States against John Mahard, Jun., and John M'Laughlin, for twenty-seven hundred and twenty-eight dollars and sixty-three cents, which was appealed to the supreme court, where the judgment was affirmed. As the lien took effect from the time judgment was entered in the superior court, it is paramount to the mortgage of the Franklin Bank. An execution was issued on the judgment, which was levied on lots 404 and 460 and other real estate. The Franklin Bank, it seems, agreed to indemnify Dyer, who purchased lot 404, against the lien of the above judgment. This lien under the judgment, extended equally to all the real estate of John Mahard, in the county of Hamilton.

We come now to consider the mortgage executed by Mahard to the Lafayette Bank.

It is dated the 7th of December, 1841, and recorded the 13th of January, 1842; and was given to secure the payment of two notes amounting to the sum of fifteen thousand dollars, on one of which John M'Laughlin was indorser, and on the other Andrew Johnson. In its answer the bank denies that the mortgage was executed in contemplation of bankruptcy, or that Mahard was then known or considered to be in a state of insolvency; and it had good reason to believe and did believe he was solvent, and fully able to pay his debts. To the validity of this mortgage following objections are made: 1. That it is void, as it purports to secure a demand on which a greater rate of interest is charged than six per centum per annum. 2. That it covers a usurious debt, and is consequently void. 3. That it is void under the second section of the bankrupt law, as it was given in contemplation of bankruptcy, and to give a preference to the bank over other creditors. The second section of the charter provides, that the "corporation shall not, at any time, take more than six per cent. per annum in advance, on their loans or discounts." Assuming that a greater amount of interest has been charged than this, the counsel rely upon the case of Bank of Chillicothe v. Swayne, 8 Ohio, 257, to show that it makes void the instrument. This decision was referred to in treating of the mortgage to the Franklin Bank, but it will now be more particularly examined. The charter of the Bank of Chillicothe declares, that "the said corporation shall not take more than at the rate of six per centum per annum, on its loans or discounts." This provision is nearly in the same language and in effect the same, as the provision in the Lafayette Bank charter. The general law of Ohio regulating interest declares that all creditors are entitled to interest "at the rate of six per cent. per annum, and no more." And in the above case the court very properly remark, "It will be observed that the language is substantially the same with that used in the statute regulating interest." From this similarity of provision it was insisted that as the general statute, by the well settled construction of the court, made the contract for usurious interest void only for the excess, the same rule of construction applied to the charter of the Chillicothe Bank. To this the court replied: "There is certainly much plausibility and no little force in the argument. But there is another question involved in construing a contract made by a corporation, and that is the question of capacity of the corporation to make such contracts. There is a great difference between natural persons and corporations. Natural persons have capacity and power to make and enter into any contracts which are not prohibited by law, and will be bound by such contracts," &c. "But it is otherwise with corporations. A corporation is a body created by law, composed by individuals united under a common name, &c.,

and derives all its powers and capacities from the law of its creation." This citation contains the ground on which the court held the contract void. It may be a matter of some doubt whether, under the rule observed by the courts of the United States, to follow the settled construction of the statutes of the states, by their supreme courts respectively, this is an open question. And if this were a general statute there could be no doubt. But it is special, and partakes both of the character of a contract and a law. In this respect we are inclined to think the case does not come within the above rule.

From the view we have taken, the decision of this question is not necessary; but as it has been elaborately argued, it may not be improper concisely to notice it. In doing this we shall suggest some considerations, with the utmost respect, which are not without weight in our own mind. It is admitted that the "powers and capacities of a corporation are derived from the law of its creation." What are the powers and capacities of the "Lafayette Bank of Cincinnati?" It has power in its corporate name "to contract and be contracted with, to sue and be sued, &c. And it is authorised to loan money, buy, sell and negotiate bills of exchange, checks, and promissory notes, and to discount upon banking principles," &c., under the restriction in regard to interest, &c. Now here is a capacity imparted to do every thing which a natural person could do, in relation to the business specified. The natural persons who compose the corporation are authorised to do in their aggregate capacity, what each one might do in his natural capacity. Now what is the difference between the natural and artificial capacities here spoken of? It is admitted that an artificial person has no power to violate the law of its creation, or any other law. Has a natural person power to violate the law? We suppose not, and in this respect no difference is perceived between the two capacities. It is not a question of capacity, but of prohibition. A natural person is prohibited from taking more than six per centum per annum interest. If it were not for this prohibition, he might agree for any reasonable rate of interest. And if the bank had not been prohibited in like manner, might it not have charged in the same way? Is there any doubt of this? It has power to loan money on interest, and no rate of interest being established by law, may it not contract for the rate of interest as a natural person? If it may not do this, it can do nothing. The prohibition in the charter acts upon the artificial capacity, as the general law, of the same import, acts upon the natural capacity of every citizen. Repeal the proviso in the charter, and the power of the bank remains, subject to the general law. Is it not, then, clearly a question of prohibition; and is not the only inquiry, whether it does not operate alike upon all capacities, artificial or nat-

ural? This question would seem to be sufficiently answered by the admitted axiom, that all laws must be equal in their operation. But they are not equal, if the same provision is made, by construction, to have a different effect. Can this difference of effect arise from the mere circumstance, that in the one case the provision is in the charter of the bank, and in the other in the general law? Suppose the charter had contained no such provision, could the general law have been so applied, as in the one instance to make void the contract, and in the other to avoid it only for the excess of interest? This, I suppose, would not have been contended by any one. And yet, is not this the question under consideration?

But it is contended, that, there is a material difference between the general law in regard to interest and the provision in the Lafayette Bank charter. The supreme court said there was no substantial difference between the general law and the provision in the charter of the Bank of Chillicothe; and that provision is in no respect different from the one in the Lafayette Bank. The general law establishes the "rate of interest," on moneys due, at "six per centum per annum and no more." The Bank of Chillicothe "shall not take more than at the rate of six per centum per annum." Now a reservation of more than six per cent. interest is usurious under the general law, as well as under the above charters. They are, then, substantially the same provision. And if a different effect be given to these charters from that which is given to the general law, it must be on the ground that the words, or provisions, in the charters are to be construed by a different rule from that which governs the construction of the general law.

It is admitted, that where a contract is made in violation of a statute, or of the policy of the law, it is void. And that a usurious contract in Ohio is not only against the statute, but in violation of the policy of the law. But the law seems to be well settled in this state, that usury constitutes an exception from the general principle; so that the contract is only void for the excess of interest. Other states have construed their laws against usury in the same way. Now, whether this construction be right or wrong, is a matter of no importance; it is the law. And if the same rule of construction be applied to the charters of the above banks, the same effect must result, on a usurious contract. That this would be the effect of a usurious contract with a bank under the general law, has not been, and indeed cannot be, controverted. So that the only ground of distinction is, that the same provision against usury in a bank charter renders the entire contract void, while, as a general law, it avoids only the excess of interest. Can this distinction be sustained on the ground that there is a want of power in the bank to make the contract. This would be

unanswerable, if there were not the same want of power to make a usurious contract by an individual. In this respect, the bank and the individual occupy the same ground. Neither can have any implied power to make a contract in violation of law; and the argument, that a bank can do nothing for the doing of which power is not given, whilst an individual may do any thing which is not prohibited, is without force, because it can have no application to the case. The act is prohibited, alike to the bank and the individual. On what principle, then, can the distinction be sustained? As has been shown, the bank has the same power, under its charter, to make a contract for the loan of money as an individual; and if more than six per centum per annum had not been prohibited, it might have charged more. But the prohibition acts upon the bank as well as upon the individual; and the only question is, does it act alike upon both? I think it does, and that there is no reason arising out of the limited powers of the bank which can affect the question.

The case of Bank of U. S. v. Owens. 2 Pet. [27 U. S.] 533, which is so much relied on, gives no support to this distinction. On the contrary, the question is treated as a general one, arising out of all contracts made in violation of law; and the cases referred to, as illustrating the principle sustained, were contracts between individuals. If the court had supposed that the charter of the Bank of the United States, which prohibited more than six per cent. per annum interest, was to be differently construed from a general law on the same subject, they would have said so, as the case arose under the charter; but no such distinction is made or referred to in their opinion. They seem not to have considered the limited powers of a corporation as having any bearing on the question. If the bills of exchange were void on the ground assumed, does it follow that the mortgage is void? The mortgage was given to secure the payment of the bills, and it is not denied, that where a contract is infected with usury, the same vice is carried into subsequent contracts covering the same transaction. But the objection now under consideration is not that the bills of exchange were usurious, but that they are void, having been given in violation of the charter. Now, does it follow that the mortgage must also be void? It is not pretended that there is a forfeiture of the sums paid by the bank on the discount of the bills. At most, it can only be argued that the instruments, as evidence of the debt, are void. Is there not, then, a bona fide consideration for the mortgage? On a general count, the bank could recover from Mahard the money loaned. And had he filed his bill for relief, setting up the same objection that is now urged, chancery would not have relieved him, except upon the payment of the money loaned, with interest; and this is the light in which the present case might be considered. The assignee represents the interests of the bankrupt and of the creditors. But, except in the case of fraud, the interests of the creditors can only be asserted through the bankrupt. There is no pretence of fraud, in this view of the case; so that the claim set up in the bill, in principle, is the same as if it had been set up by Mahard himself. But it is not necessary to a decision of the case to determine this point, or whether more than legal interest reserved on the bills discounted would make them void, in whole or in part. Were the bills discounted by the Lafayette Bank usurious? The facts in relation to the discount of these bills have already been considered, in reference to the Franklin Bank. No more than the legal rate of interest, in advance, was charged by the Lafayette Bank, to which was added the same premiums as charged by the Franklin Bank on time bills. Nothing more need be said on this head.

The third ground remains to be considered, whether the mortgage is void under the second section of the bankrupt law, as having been given in contemplation of bankruptcy and to give a preference to the bank over other creditors. As the construction of this section has already been discussed, nothing more is now necessary than to examine the facts on which this charge against the Lafayette Bank is attempted to be maintained. From the evidence it appears that in October, 1841, John Mahard addressed a letter to the bank asking for the loan of fifteen thousand dollars, to secure the payment of which the mortgage was given, to enable the company to carry on its business at Cincinnati and at New Orleans. The bills on the latter place, discounted by the bank, were about becoming due, and the loan was necessary to enable the firm to pay them.

By this application to the bank it satisfactorily appears, that Mahard had no intention to break up his business, as the loan was obtained to enable him to carry it on. In this view then, it was no violation of the bankrupt law. His object being to continue his business, he could not have executed the mortgage in contemplation of bankruptcy. The time given for payment of one, two and three years, shows great embarrassment; but unless from the circumstances attending the execution of the mortgage the inference is clear, that he intended to break up his business and to give a preference to the bank over the other creditors of the firm, the instrument is not void. This loan was not made, by extending previous loans, but to enable the Mahards to take up drafts which would soon become due. The money was paid by the bank and the mortgage taken at the same time. So that there was no preference in the case; and indeed there could be none under the circumstances. The bank stood more in the light of a purchaser, than in that of a creditor. And the question is, whether Mahard was in a condition to ex-

ecute a valid mortgage on the advance of money, there being no pretence of fraud in the transaction. I can entertain no doubt on this subject. There is no provision of the bankrupt law which invalidates it. There is no principle in morals which makes it questionable. John M'Laughlin states that he believes now the Mahards were insolvent in the beginning of the year 1842, but at that time he thought otherwise. In the latter part of the year 1841 or the beginning of the year 1842, Josiah Lawrence, the president of the Lafayette Bank, in a conversation with the witness, said, "that the Mahards had failed or would fail shortly; or were in failing circumstances, or words of similar import." This conversation with Lawrence, in all probability, was subsequent to the execution of the mortgage. But whether this be the fact or not it cannot affect the mortgage; and the opinion of M'Laughlin in 1842, that the Mahards were solvent, goes rather to strengthen their business transactions at that period. Upon the whole we think that the mortgage to the Lafayette Bank must be considered and treated as a valid instrument. The above loan of fifteen thousand dollars was to be paid in three equal annual instalments. On the 12th of January, 1842, Mahard transferred forty-nine shares of stock, which he held in the Lafayette Bank, to that bank, as collateral security for the payment of the first instalment of this loan. On the 15th of December, 1841, the bank discounted a bill for $3,-420 at sixty days, drawn by M'Laughlin on Mahard & Brother, of New Orleans, and indorsed by J. & W. Mahard. This was a renewal of a prior bill of the same amount, same drawer and acceptors, and indorsed by the Mahards and Andrew Johnson. But the indorsement of Johnson on the renewal was omitted, as alleged, through inadvertence. On the 1st and 8th of February, 1842, two notes were discounted, one of $163 and the other $162, same drawer and indorsers. No collateral security at the time of these discounts was taken by the bank. But on the 16th of February, 1842, Mahard mortgaged to Johnson lots 404 and 460, on Water street, to indemnify him as indorser on these bills, one held by the Commercial Bank, one by Milne & Co., which has since been paid, and the other, the above bill of $3,420, held by the Lafayette Bank. This mortgage, it is contended, should be made to enure to the benefit of the bank.

It is also insisted that the forty-nine shares of bank stock should be applied in payment of the above sum and of the two smaller discounts under the lien given by the charter of the bank. The tenth section of the charter provides that the "bank shall have the first lien in law on all stock and dividends owned by its debtors; and no debtor to the bank is permitted to transfer his stock, unless he shall have given collateral security for the payment of his debt." This stock, shortly after the discount of the bill for $3,420, as above stated, was transferred to the bank as collateral security for the payment of the first instalment of the $15,000 loan. And the bank now insists that as that instalment was not paid, through the default of Mahard, and as the bank was injoined from enforcing the mortgage, it is now entitled to a sale of the real property under the mortgage to satisfy it, and that the stock not being applied as was intended, and being released from the transfer, should be appropriated under the charter lien to the payment of the above bill, and the two smaller discounts. On the same paper which contained the assignment of this stock to the bank, John Mahard, Jun., indorsed, the 13th of April, 1842, "the forty-nine shares of stock are transferred to John S. Buckingham for value received."

Nearly a month after the discount of the above bill for $3,420, this stock was transferred to the bank as collateral security for the payment of the first instalment on the large loan. This shows that the bank did not rely upon the lien on the stock for the payment of the above bill. Mahard having given a mortgage to secure the payment of the fifteen thousand dollar loan, that debt was no obstruction to the assignment of the stock. It was assigned to the bank with its assent, and the question is, whether such assignment extinguishes the charter lien. There would seem to be no doubt that at least for the time being, it does extinguish such lien. If the first instalment of the large loan had been paid by Mahard, by the condition of the assignment the stock was to be re-transferred to him. But the payment was not made, and the stock still remains pledged. It stands, therefore, on the pledge and not on the charter. Had the stock been re-transferred, the charter lien would have attached, but at present it is extinct, and can only be revived by a re-investment of it in Mahard. Opposed to this re-investment stands not only the first instalment of the large loan, but the assignment of the stock to Buckingham. This assignment could not prejudice the lien of the bank under the transfer; but the stock being placed by the transfer beyond the provisions of the charter, it is no longer under its restriction; and the residuary interest may be assigned, it is supposed, as any other mortgaged property. Whether the assignment to Buckingham is not void, it having been made within sixty days preceding the filing of the petition of Mahard, will be examined hereafter. It is enough to know, in this part of the case, that the charter lien having been destroyed or suspended by the transfer, does not attach to the stock as it now stands to secure the bills discounted subsequently to the large loan. The final disposition of this stock is reserved until the proceeds of the mortgage shall be realised. As regards the general creditors it can be of no importance whether the stock or the land shall be first sold; but if there be additional valid liens on either, it

will influence the order of distribution. The bank also claims that the mortgage given to Andrew Johnson should be made to enure to its benefit. This is opposed on several grounds, but chiefly because the name of Johnson does not appear on the bill, to indemnify him against which the mortgage was given. In answer to this fact, it is alleged that the omission was inadvertent. That the above bill was the renewal of a former bill of the same amount on which Johnson was indorser.

A creditor may claim all the liens held by the sureties of the principal debtor; and to avoid circuity of action, he may enforce those liens. This procedure is founded upon the liability of the sureties; for if they are not liable, there can be no ground of claim by the creditor. Now as the name of Johnson is not on the bill held by the Lafayette Bank, it is not perceived how any liability can attach to him on that bill. It may have been given to renew a former bill, of the same amount, which had the indorsement of Johnson. But that bill has been paid by the renewal, and consequently the indorser is discharged. Now the liability of an indorser is a matter of law, there being no consideration by which, in equity, he can be made liable. Had there been an express agreement by Johnson to indorse the bill, by reason of which it was discounted, and through inadvertence his name had not been indorsed, on sufficient proof equity might compel him to indorse the bill. But this is not the case before the court. There is no other evidence of Johnson's connection with the bill, than his indorsement of the one paid by it, and the provision in the mortgage to him in relation to it. The mortgage seems to have been executed by Mahard, and delivered for record without the knowledge of Johnson.

It is not perceived on what ground of equity M'Laughlin, who is surety on the bill for $3,420, can claim to be indemnified under the mortgage to Johnson. A co-security may claim that property given to indemnify one security shall be sold for the benefit of both; but, in this case, Johnson cannot be considered as a co-security, seeing his name is not on the bill. At the July term of the superior court of Cincinnati, a judgment was obtained by the trustees of the Bank of the United States against John Mahard, Jun., as principal, and John M'Laughlin as security, for $2,728.63; which was appealed to the supreme court, in which at April term, 1842, a final judgment was rendered for $2,979.69. Execution was issued on this judgment, which was levied on all the real estate of Mahard in Hamilton county. This constitutes a lien on the above property from the date of the judgment in the superior court, and is prior to that under the mortgage to the Franklin Bank, and all the other mortgages of subsequent date. On a sale of the property the proceeds must be so distributed as to satisfy the largest amount of valid liens. This will conform to the principles of equity. M'Intyre, it appears, holds a mortgage on the farm recorded the 22d of March, 1832, to secure the payment of two notes of four hundred dollars each. This mortgage, being the earliest lien on the farm, must be first paid.

On the 13th of January, 1842, John Mahard, Jun., mortgaged, to the Northern Bank of Kentucky, certain real estate in Kentucky, to secure the payment of certain bills drawn by J. & W. Mahard, indorsed by Andrew Johnson, accepted by Mahard & Brother, of New Orleans. Some of the bills were indorsed by Johnson and John M'Laughlin. This mortgage was recorded two days after its execution. The bank filed its bill in July, 1842, and obtained a decree for the sale of the mortgaged premises, which were sold for $11,203.63, including rents. This left a balance on the mortgage debt of more than $5,000, with which the indorsers of Mahard were charged. The bank also claims the benefit of a mortgage on personal property, executed by Mahard to Johnson, March 18th, 1842, to secure the bills indorsed by him to the bank. This mortgage was assigned to the bank, June 3d, 1842, and the bank agreed to release Johnson from his indorsements, provided the property mortgaged should be decreed to it. On this assignment, proceedings were instituted, in the names of Johnson and the bank, in the superior court of Cincinnati; and, by an order of that court, the property was sold for about $1,300, after paying costs. And this sum the court decreed to Buckinghams, who had levied an execution upon it, holding the mortgage to Johnson void. On the bills discounted by the bank, the same interest was reserved, and exchanges charged, as in the discounts of similar bills about the same time, by the Franklin and Lafayette Banks. There is nothing in this case which distinguishes it from the discounts of those banks which have been considered. We, therefore, hold that these discounts were not usurious, nor the instruments given to secure the same void, under the charter of the bank. Nor are there any facts conducing to show that, in the execution of this mortgage on the real property, Mahard contemplated bankruptcy, or that the bank could have had any notice of such intention. From the evidence, it appears that, in obtaining the loans from the bank, and the extension of them, he was endeavoring, in good faith, to surmount his embarrassments. By the frequent conversations of John Mahard, Jun., and his oath, at this time, it appears he hoped to sustain himself, and that he cherished the same hope for several months afterwards; and there is nothing in the case which authorises a doubt that he acted in good faith. Like hundreds of others struggling under embarrassments, he did not see or apprehend the bankruptcy which was before him.

A question is made, whether the court can

take jurisdiction of the mortgage on the real estate in Kentucky. As no ground is perceived on which that mortgage can be invalidated, or the proceedings on it in the state court avoided, the question of jurisdiction becomes measurably unimportant. On this point, however. it may be proper to remark, that the bank having submitted to the jurisdiction of the court, by filing its answer in this case, it must be considered as before the court, for the purposes of the complainant's bill. A decree cannot operate as a conveyance of land out of the state, as it does, under the statute, within the state; but this is a matter which does not affect the jurisdiction. Having jurisdiction of the parties, by a voluntary appearance, the court may decide the controversy between them, and effect may be given to the decree, as the law shall authorise. The validity of the mortgage to Johnson on the personal property will now be considered. This mortgage was dated the 18th of March, 1842, and was given to secure the mortgagee against certain indorsements. referred to. It was executed by Mahard without the knowledge of Johnson, and delivered to the recorder of deeds. This is not, of itself, a circumstance which would excite strong suspicion against the deed. It might be shown to have been done with a bona fide intention. The property covered by the mortgage was personal, and it remained in possession of Mahard. This is a badge of fraud, though it may be susceptible of a satisfactory explanation. One or two articles were delivered in the name of the whole. By an agreement of the same date as the mortgage, Mahard was to take charge of the property, and to make sales thereof, in whole or in part, consulting and advising with Johnson, and paying the proceeds to his benefit. This mortgage was executed but little more than sixty days before Mahard filed his petition. The house of Mahard & Brother failed about the 1st of March, and the mortgage was dated the 18th of the same month. It was executed without the knowledge of Johnson. Mahard continued to exercise acts of ownership over the property, selling a part of it at different times, and offering to sell the whole of it. At one time, he proposed to sell at auction; at another, to take the property down the river for sale. Occasionally, though not generally, in selling and offering to sell parts of the stock, he would refer to Johnson's mortgage, and say he was acting with his consent. But, upon the whole, he seemed to exercise in every respect, acts of ownership over the property; and, indeed, he says that Johnson consented that he should sell the property, at the prices proposed, in payment of other debts than those indorsed by him. About the middle of May, 1842, in a conversation with one of the witnesses, Johnson said he held a mortgage on the property, for the benefit of Mahard's creditors generally; that he had a claim, but that he did not con-

sider the mortgage as securing it more than the claims of other creditors. Upon the whole, we think that this mortgage, under the circumstances, cannot be sustained. It was given to protect the property from other claims, and, under such protection, to enable Mahard to pay his debts, by selling the property at exorbitant prices. To this Johnson assented. This deferred and hindered creditors, which avoided the instrument under the state law. It was also void, as having been given in contemplation of bankruptcy. At the date of this instrument, Mahard could have had no rational hope of paying his debts. Whatever may have been his declarations to the contrary, the accumulation of his embarrassments must have convinced him that the crisis could no longer be postponed; and he resolved to adopt the desperate expedient, to cover his personal property by the mortgage to Johnson, that he might pay his debts with it at any price he might impose. For a cow, he asked $1,200; for some of his Berkshire hogs, $300 a piece; small pigs, $60 a pair; for calves, $100 a piece; cows, of common stock, $50 a piece, not worth more than from ten to twelve dollars. A schedule of the property, at these prices, was exhibited by Mahard, which made an amount of about $26,000. It was, no doubt, expected that, seeing his embarrassments, and knowing that this property was under mortgage, his creditors would become purchasers at any price. This object is fairly inferrible from the facts, and as, from the face of the mortgage, a preference was given to Johnson, it is void under the bankrupt law, and also under the state statute.

The mortgage set up by the Commercial Bank will be now examined. On the 16th of February, 1842, John Mahard conveyed to Andrew Johnson all his interest in lot 460, in Cincinnati, conditional that the mortgagor should cause to be paid unto the said Johnson, or rather protect and save him harmless from "his liability as indorser" of a certain bill of $3,500 indorsed by him for Mahards; the mortgage being "to secure said Johnson on his indorsement as aforesaid." In October, 1842, a judgment was obtained by the bank on the above bill against the Mahards as drawers and M'Laughlin and Johnson as indorsers. On which judgment execution was issued and returned no property found. This mortgage was executed and recorded without the knowledge of Johnson. Mahard states that he believed at the time this mortgage was given, they would be able to meet all their liabilities; but he was desirous of securing his indorsers against any contingency, and with that view the mortgage was executed. The debt to the bank was a bona fide one, and Johnson was liable for it as indorser. At this time the house in New Orleans had not failed, and there is no reason to doubt that Mahard believed, as he has sworn, that they would be able to sustain themselves. And from the facts, there is

reason to believe, that Johnson did not consider the Mahards insolvent. As the mortgage was executed without his request, it appears he could have felt no very great solicitude in regard to his liabilities as their indorser. On the whole we think this instrument cannot be held void under the second section of the bankrupt law, as having been made in contemplation of bankruptcy and with a view to give the Commercial Bank a preference over other creditors. But this mortgage was afterward declared on the record to be canceled through the influence of the Buckinghams, who were interested in annulling it. This procedure was procured through the misapprehension of Johnson, and cannot operate to the prejudice of those who might claim under the mortgage. Being indorser to the bank, Johnson, as mortgagee, became the trustee of the bank, and could not destroy that which was designed by the mortgagor, if such be the construction of the mortgage, for the benefit of the bank. And more especially would a court of equity disregard the cancelment of such an instrument by the trustee, through the fraudulent representations of interested persons.

It is objected that this is a mortgage of indemnity merely, and that unless Johnson be damnified, neither he nor the bank can claim any thing under it. A judgment has been obtained against Johnson as indorser, on the bill of exchange named in the mortgage, and this fixes his liability. Must the bank proceed against him and sacrifice his property, if he have any, before it can reach the property pledged for his indemnity? On the contrary, may not the bank proceed directly against the mortgaged property? This would seem to be equitable. It saves the security and subjects the property of the debtor, as it should be subjected, to the payment of the debt. No objection is perceived to this principle. The solvency or insolvency of the surety cannot affect it. If the procedure against the property pledged in any degree is made to depend upon the amount of property the surety may have, then in every case the surety must pay the money, by suffering a judicial sale of his property or otherwise, before the mortgaged property can be reached by the creditor. This would be in violation of the plainest equity, and contrary to the established mode of chancery proceedings. When justice can be done and a circuity of action avoided, chancery will do it. A surety is damnified, when a judgment is obtained against him. And this gives him a right to proceed against the pledged property of his principal; and with the consent of the creditor, it may be made answerable for the payment of the debt. 1 Story, Eq. Jur. §§ 502, 638; Bank of U. S. v. Stewart, 4 Dana, 27; Green v. Dodge, 6 Ohio, 85; Wright v. Morley, 11 Ves. 22; West v. Belches, 5 Munf. 187; M'Mahon v. Fawcett, 2 Rand. [Va.] 514; Tankersley v. Anderson, 4 Desaus. Eq. 44.

The Commercial Bank has only the lien, through Johnson, on lot 460, and as the judgment of the Bank of the United States against Mahard and M'Laughlin is a lien upon that lot, and the other real estate of Mahard, and also of M'Laughlin's, it is claimed that the judgment should be made out of the other property of the defendants, or at least that their property should be exhausted before the lien is enforced against the above lot. It is a common principle in equity where two or more tracts of land are covered by a lien, and there is another lien upon one of the tracts, to require the lien common to the whole property first to exhaust that part which is not common to both liens. And this will be done in the present case. As the whole property must be sold, the distribution of the proceeds will be made in accordance with this principle. The two mortgages executed by Mahard to Mark Buckingham and to Mark and John S. Buckingham, dated 21st February, 1842, on lots 404 and 460, will be next examined. This instrument, it is alleged, is void under the second section of the bankrupt law, it having been given in contemplation of bankruptcy and to prefer the mortgagees to other creditors. As Buckinghams had some connection with the Mahards in the fall of 1841, it is insisted, that they must have known that they were insolvent and on the verge of bankruptcy before the mortgage was executed. It is not shown that the connection referred to extended farther, by the Buckinghams, than to occupy the pork house of Mahard in Cincinnati, and to ship pork to the house of Mahard & Brother in New Orleans. These shipments go very strongly to refute any presumption of knowledge injurious to the credit of the Mahards; and on the contrary show that the Buckinghams had confidence in their ability and integrity. And there is nothing in the evidence which goes to destroy this confidence, until the failure of the house in New Orleans. About that time, Mark Buckingham, being in New Orleans, seems to have been fully apprised of the desperate condition of that house, and of the urgent necessity of using the utmost circumspection and vigilance to secure their claim against the Mahards. This was in the early part of March, 1842, subsequent to the date of the mortgage. These facts, therefore, cannot be made to have any bearing upon the execution of that instrument. And aside from these, no facts have been proved which show that the mortgage was given in contemplation of bankruptcy, and to give an illegal preference. There are prior liens on the property covered by this mortgage, which may exhaust it; and if this shall not be the case, the Buckinghams must show that they are liable for the debts secured by it, or have paid them. This is a matter which will necessarily come up on a final distribution of the proceeds.

The judgment confessed by Mahards, in

favor of Buckinghams, is the next question to be considered. On the 7th of April, 1842, a power of attorney was executed by John Mahard, Jun., to William Corry, Esquire, authorising him to confess a judgment in favor of the Buckinghams, for about the sum of fourteen thousand dollars; and on the succeeding day a judgment for that sum was confessed. This was within sixty days before the petition of Mahard was filed. An execution was issued on the judgment, which was levied on the personal property of the bankrupt. Was this proceeding void under the bankrupt law? The first proviso of the second section is, "That all dealings and transactions by and with any bankrupt, bona fide made and entered into more than two months before the petition filed against him or by him, shall not be invalidated or affected by this act." Now, this very clearly implies that transactions within the two months, though bona fide, are not valid. For, to make transactions valid before the two months, they must have been entered into in good faith. The proviso, therefore, if it mean any thing, as to transactions within the two months, intended to place them upon a different footing from transactions beyond that limitation. This is the clear inference from the language of the section. But it is asked, is every sale across the counter, within the two months, void? This is not a fair test of the principle. For although it may be impracticable to avoid minute transactions, yet is this any reason why large and important transactions should be held valid? A man, to defeat his creditors, may distribute his property in such small parcels, as to render any attempt to reclaim them impracticable. But from this it would not follow that creditors might not set aside the entire stock of a merchant, fraudulently transferred. That congress have power to adopt a provision having the above effect, is undoubted. Under the bankrupt power, they annihilate the contract—not being restrained or prohibited, as the states are, from impairing its obligation. It is, then, a question of policy with congress, and, with the courts, a question of construction. And it must be admitted, that some effect must be given to the proviso; and if this be done, it follows, that a contract made within the two months is not to be treated as a contract made before that time. But, in disposing of this judgment and the execution which issued upon it, we need not rely upon this construction of the proviso. At the time this judgment was entered, Mahard had no visible means, except the property afterwards levied on. The house at New Orleans had failed. Mark Buckingham's letters from that place show how utterly hopeless was the prospect of finding any assets of that concern. He imposed on his friends at Cincinnati the utmost caution, in order to reach the property of Mahard at that place. The business of both houses had been broken up; their credit gone. Mortgages had been multiplied on the real and personal property of Mahard; and even this personal property had been covered by a mortgage. In this desperate condition of Mahard's affairs, he was induced to yield to the pressure of the Buckinghams, and give a warrant of attorney to confess the judgment. The judgment was entered, and the execution was issued and levied. And yet it is contended, that these facts do not show a contemplation of bankruptcy by Mahard, or a preference of the Buckinghams as creditors. The judgment, if valid, constituted a lien on the real estate, and the levy of the execution a lien on the personal property. These proceedings were had with the consent of Mahard, and could only have been had with his consent. The warrant of attorney was not signed by William Mahard, until some time after the rendition of the judgment.

In the first section of the bankrupt act, it is declared, that if a debtor "shall willingly or fraudulently procure himself to be arrested, or his goods and chattels, lands or tenements, to be attached, distrained, sequestrated, or taken in execution," he is guilty of an act of bankruptcy. Do not the acts of Mahard bring him within this provision? By the confession of the judgment, did he not procure the lien consequent upon that judgment, and also the execution which was levied on his property? Is not the judgment lien a "security," within the second section of the act? It is a matter of surprise, that a procedure so open as this—a procedure so plainly in violation of the bankrupt act, and coming, too, within the two months before filing the petition, should be attempted to be sustained. The judgment and execution were void under the act. Where a suit had been commenced in the ordinary course of judicial proceeding, and a judgment had been entered within the two months, it might not be void. But where, by the consent of the bankrupt, the proceeding is commenced and consummated in a few days, within the two months, there could be no more glaring and indisputable act of fraud against the bankrupt law. No analogies drawn from the bankrupt laws of England, which, in many of their provisions, are wholly different from this act, can aid us in giving a construction to it. And the same remark may be made in reference to our former bankrupt act, and to the constructions given to it by the state courts. The transfer, by Mahard, of the forty-nine shares of the stock of the Lafayette Bank, having been made to John S. Buckingham on the 13th of April, 1842, but little more than one month before the petition in bankruptcy was filed, and under a knowledge of the above facts, must be held as void under the bankrupt act.

[NOTE. The case was finally heard in the circuit court on exceptions to the master's report. Case No. 8,889. An appeal was then taken from the decree entered to the supreme court,

which affirmed the decision of the circuit court. Mr. Justice Curtis delivered the opinion. 13 How. (34 U. S.) 151.]